1
2
3
4
5
6
7
8     **IN THE UNITED STATES DISTRICT COURT**

9     **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    DORIS PRINGLE,                                    No. CIV S-07-1254-CMK

12              Plaintiff,

13         vs.                                          <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
      SECURITY,
15
                Defendant.
16    _____/

17              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19    Pursuant to the consent of the parties, this case is before the undersigned for final decision on

20    plaintiff's motion for summary judgment (Doc. 15) and defendant's cross-motion for summary

21    judgment (Doc. 19).

22                            **I.  PROCEDURAL HISTORY**

23              Plaintiff applied for social security benefits on July 20, 2005.  In her application,

24    plaintiff claims that her disability began on May 15, 2005.  Plaintiff claims her disability consists

25    of a combination of various back disorders including degenerative joint disease, neck and low

26    back pain, obesity, and diabetes mellitus.  Plaintiff's claim was initially denied.  Following denial

of her request for reconsideration, plaintiff requested an administrative hearing, which was held

on August 16, 2006, before Administrative Law Judge ("ALJ") William C. Thompson, Jr.   In his

December 14, 2006, decision, the ALJ made the following findings:

> 1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.
>
> 2.    The claimant has not engaged in substantial gainful activity since May 15, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3.    The claimant has the following severe impairments: obesity, degenerative disk, lumbar and cervical spine.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(c) and 416.920(c), 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  In addition, she has an affective disorder which is not a severe mental impairment.
>
> 4.    After careful consideration of the entire record, I find[] that the claimant has the residual functional capacity to lift and/or carry up to 25 pounds frequently and 50 pounds occasionally; stand and/or walk for 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour workday; occasionally bend; and no climbing or work around heights or moving machinery.
>
> 5.    The claimant is capable of performing past relevant work as a machine operator and shipping clerk.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).
>
> 6.    The claimant has not been under a "disability," as defined in the Social Security Act, from May 15, 2005 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

After the Appeals Council declined review on May 4, 2007, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following medical

records:

> 1.    Medical Records covering the period from March 9, 2004 to December 12, 2005 from Tri City Health Center (CAR 174-204);
>
> 2.    Medical Report, Comprehensive Neurological Evaluation, dated September 18, 2005 from MDSI Physician Services (CAR 164-66);

/ / /

3.      Medical Records dated October 4, 2005 from Alameda County Medical Center (CAR 167-68);

4.      Physical Residual Functional Capacity Assessment, dated October 11, 2005 (CAR 155-62);

5.      Psychiatric Review Technique, dated October 14, 2005 (CAR 163);

6.      Medical Report dated November 3, 2005, from Jan Dickey, M.D. (CAR 169-73);

7.      Medical Records covering the period from November 18, 2005 to January 6, 2006 from Alameda Health Care Center (CAR 205-10);

8.      Medical Records covering the period from June 14, 2005 to July 11, 2006 from Jan Dickey, M.D. (CAR 244-45);

9.      Medical Records covering the period from January 20, 2006 to March 15, 2006 from Alameda County Medical Center (CAR 211-43);

10.     Medical Report, MRI, dated July 26, 2006 (CAR 246);

11.     Medical Report dated July 27, 2006 from Jan Dickey, M.D. (CAR 247-51).

**A.     Plaintiff's Treating Physicians**

**2004**

Plaintiff had an x-ray of her right wrist on March 9, 2004, which showed no bony or significant soft tissue abnormality.

Plaintiff was seen on June 14, 2004 for a follow up on her diabetes, HTN, and complaints of bilateral wrist pain.  Dr. Dickey questioned whether the wrist pain was carpal tunnel syndrome or tendinitis, and referred plaintiff for x-rays and a neuro evaluation.

On July 26, 2004, plaintiff was seen for another follow up and refill of her prescriptions.

On August 27, 2004, plaintiff had an electrodiagnostic study, which found very mild bilateral carpal tunnel syndrome.  Dr. Dutaret indicated plaintiff's history included surgery 20 years prior, found no repeat surgical intervention would be warranted, and recommended clinical correlation.

1    Medical records dated September 29, 2004 indicated plaintiff had been diagnosed

2    with Diabetes Type II.  Although most of the report is unreadable, it is clear that the physician

3    notes that plaintiff is doing well.

4    Plaintiff was seen on October 23, 2004 for a follow-up on her diabetes and an

5    upper respiratory infection.  She was told to follow up as needed.

6    **2005**

7    Plaintiff was next seen on January 6, 2005 as a follow up on her diabetes.  She

8    complained of pain in her right shoulder.  Dr. Glenn-Lawson noted her diabetes was well

9    controlled, she was to continue her cane use, and suggested a follow up in three months.  For

10   plaintiff's shoulder pain, she was advised to apply ice and moist heat, and was given a

11   prescription of Relafen.

12   On February 7, 2005, plaintiff was seen again, complaining about pain in her

13   neck.  Dr. Dickey diagnosed her with a cervical strain and prescribed Naprosyn.

14   On February 25, 2005, plaintiff was seen for a follow up on her diabetes.  Dr.

15   Glenn-Lawson noted plaintiff was still trying to lose weight, but has been stressed and nervous.

16   Plaintiff was referred to neurology for arm pain and numbness, but Dr. Glenn-Lawson noted her

17   pain had improved with the Relafen.  Plaintiff's diabetes was well controlled, she was to

18   continue to use her cane, and follow up in three months.  Plaintiff was also to schedule an

19   appointment with a registered dietician regarding her obesity.

20   On June 14, 2005, plaintiff saw Dr. Glenn-Lawson again.  Plaintiff stated she was

21   going to the gym, but complained about arthritis in her lower back which caused sciatica and

22   numbness in her right heal.  Dr. Glenn-Lawson noted plaintiff has degenerative joint disease in

23   the c-spine region.  Plaintiff also complained about tingling numbness in her hands at times, and

24   was again referred for an orthopedic and neurologic exam.  On examination, plaintiff had

25   tenderness in her lumbosacral spine region, and tenderness over her right sacroiliac joint.

26   / / /

1    On July 26, 2005, plaintiff was seen for a follow up on her diabetes and

2    degenerative joint disease.  Plaintiff reported doing well except for paresthesia in her lower

3    extremities with possible weakness.  Her assessment was L-S strain.

4    She had both a cervical spine and lumbar spine x-ray on July 29, 2005. The

5    radiology report regarding the cervical spine states:

6    C7 vertebral body not seen on lateral views presented.
     Hypertrophic spurring is noted at multiple levels with some
7    interspace narrowing at C4-5, suggesting some degenerative disc
     disease.  The remainder of the vertebra and intervertebral disc
8    spaces are within normal limits.

9    Regarding the lumbar spine the report states:

10   Mild hypertrophic spurring at several levels, though the vertebra
     and intervertebral disc spaces are quite well maintained.
11   (CAR at 179).

12   On August 11, 2005, plaintiff was seen for a follow up on her labs and x-rays.

13   She was assessed with a lumbosacral strain and prescribed Naprosyn and Tylenol #3.

14   On September 12, 2005, plaintiff complained of right wrist pain.  Dr. Dickey

15   assessed plaintiff with mild carpal tunnel syndrome and diabetes mellitus, and refilled her

16   medications.  He noted they were awaiting an MRI.

17   Plaintiff had an MRI of the cervical spine on October 4, 2005.  The preliminary

18   report found:

19   The C1 articulation and foramen magnum appear normal.
     C2-3:  No abnormalities are observed
20   C3-4:  Minor disc bulging is noted without evidence of cord
     impingement, however, there is bilateral foraminal stenosis.
21   C4-5: Disc narrowing, spondylosis and broad-based disc bulging is
     noted.  There is central stenosis with cord impingement, cord
22   contour deformity and cord signal abnormality.  Degenerative
     changes in conjunction with disc bulging have resulted in bilateral
23   foraminal stenosis.
     C5-6: Central 2-3 mm disc herniation noted with cord
24   impingement and cord contour deformity.  Abnormal cord signal is
     present, somewhat less than that noted at the above levels of C3-4
25   and C4-5.
     C6-7 through C7-T1: No abnormalities are observed.

26

1
2
3
4
5

CONCLUSION: There is central stenosis at the C4-5 and C5-6 levels. This is secondary to broad-based disc bulging at the C4-5 level and central herniation at the C5-6 level.
2. The abnormal cord signal noted at the C3-4, C4-5 levels is secondary to either cord edema or gliosis.
3. Foraminal stenosis is noted, C3-4 through the C5-6 level.
4. There is a 0.2 cm nodule, right lobe of the thyroid. This presumably represents a cyst.

(CAR 178).

6
7
8
On October 13, 2005, plaintiff saw Dr. Dickey for another follow up for her diabetes and cervical spondylosis. The notes from this visit are somewhat illegible, but it appears plaintiff was doing well except for her paresthesia.

9
10
11
12
13
Plaintiff had a follow up of her cervical stenosis on November 2, 2005. Plaintiff was prescribed Baclofen and Vicodin. Dr. Dickey noted plaintiff was upset about her pain and decrease in her quality of life. The notes from this visit are again somewhat illegible, but it appears plaintiff was assessed with herniated nucleus pulposus (HNP) and cervical stenosis, with her motor strength at 3/5 in her right lower extremities and 5/5 in her left lower extremities.

14
15
16
17
18
19
On November 5, 2005, Dr. Dickey completed a medical assessment form on plaintiff's behalf. Dr. Dickey stated the clinical findings he made were right lower leg weakness, and herniated disc. These findings were supported by an MRI which was positive for stenosis, cervical/L-S spine. Dr. Dickey's diagnosis was herniated nucleus pulposus, degenerative joint disease, and cervical stenosis. Plaintiff treatment was physical therapy, to which she responded poorly, and she was in need of surgery. Dr. Dickey's prognosis for plaintiff was fair.

20
21
22
23
24
25
26
The limitations Dr. Dickey assessed included only lifting up to 20 pounds occasionally and never any higher, sitting only one hour and no standing or walking in an eight hour workday. Plaintiff was able to use simple grasping frequently, but her fine manipulation ability was limited to occasionally. She was able to use her feet only occasionally. Dr. Dickey stated these medical findings were supported by physical examination. He opined plaintiff could never climb, balance, stoop, crouch, kneel or crawl due to decreased motor strength in her right lower extremity of 3/5. Plaintiff was able to occasionally reach, handle, and feel, continuously

1  hear  and speak, but never push or pull.  She was also restricted from heights, moving machinery,

2  and vibrations.

3           A radiology report dated November 20, 2005 from a right hip x-ray showed no

4  bony or significant soft tissue abnormality.

5           On November 23, 2005, plaintiff was seen at the Alameda County Medical Center

6  for an MRI of her lumbar spine.  Plaintiff indicated her pain level was a 10 out of 10, in her right

7  leg, hip, right back, and both hands tingling.  The pain lasted all day long.  Plaintiff's medication

8  included Vicodin, Baclofen, Metformin and Motrin.  Plaintiff presented herself in no apparent

9  distress.  Neurologic examination found "absent pin-prick sensation to region of L4 & L5

10  dermatomes on right."  Plaintiff's assessment was "cervical disc herniation with cord

11  compression; will continue Baclofen and start TCA for further symptomatic relief.  Neurosurgery

12  agrees to assess patient for surgical candidacy."  (CAR 209).

13  **2006**

14           Plaintiff was seen by Dr. Patel on January 6, 2006 as a referral for severe cervical

15  stenosis and C4-5 and C5-6 herniated disks.  She complained of bilateral arm burning and pain,

16  had no difficulty with walking or ambulation, and had normal strength throughout in testing, but

17  was "clearly hyperreflexic in her lower extremities."  Dr. Patel reviewed plaintiff's MRI, noting

18  that it showed "severe cervical stenosis from C3-C6, due in large part to posterior interspinous

19  ligamentous hypertrophy causing posterior compression and then coupled with a C4-5 anterior

20  cervical disk herniation, as well as a C5-6 anterior cervical disk bulge.  She does have evidence

21  of T2 signal change already in her spinal cord at C4-5 due to the severe compression."  Dr. Patel

22  opined plaintiff needed surgery, "but given the burning nature of the pain and the T2 signal

23  change in the center of the cord consistent with a central cord injury of those pain fibers" he was

24  concerned that plaintiff's pain may not be completely relieved with the surgery.  Dr. Patel's plan

25  was to "undertake a posterior cervical decompression and fusion from C3-C6 given the

26  distribution of pain in all radicular distributions in her arm and not referable in the C4-5 or

C5-6." (CAR 207).

On January 20, 2006, plaintiff was seen at Alameda County Medical Center to complete the paperwork for her surgery, which was scheduled for February 9, 2006. During this visit, she reported she had no pain.

There are notes in the record from Alameda County Medical Center from February 9, 2006 to February 16, 2006, which are largely illegible, but appear to be from plaintiff's hospital stay regarding her surgery.

On February 13, 2006, plaintiff had a physical therapy evaluation. It indicates plaintiff was in significant pain following surgery, and was unable to sit by herself from a supine position. By the next day her pain was much better, but she still had burning and tingling in her upper extremities. On February 15, 2006, plaintiff reported her pain was six to eight out of 10 while at rest, but increased to 10 out of 10 with any attempt to come fully upright. Physical therapy recommended a trial use of cervical collar for support, muscle relaxant and anti-inflammatory medication, in addition to the Vicodin she was already on.

On February 16, 2006, plaintiff was discharged from the hospital to a rehabilitation facility.

On March 15, 2006, plaintiff was seen for a follow up. She reported her pain had resolved, but she had decreased sensation in her right hand along with decreased fine motor skills in her right hand. She had difficulty turning to the left, but no pain in her neck. The progress notes indicate she had an x-ray on February 22, 2006 which showed good alignment. On physical examination, plaintiff had 5/5 strength in both upper extremities, decreased fine motor abilities in her right fingers, but a strong grip.

On June 7, 2006, plaintiff was seen by Dr. Glenn-Lawson. Although the notes are largely illegible, it appears she was seen for a refill of her medications.

/ / /

/ / /

1      Plaintiff had an MRI of her cervical spine on July 26, 2006.  The report states:

2      FINDINGS:  A thickening of the posterior longitudinal ligament
       suggests that there may be underlying ossification.  Correlation
3      with routine radiographs and/or CT may be of value.
                There is loss of signal in the operative site posteriorly at the
4      C3, C4, C5 and C6 levels.  There is minimal central stenosis at the
       C6 level or there is cord deviation; however, the normal cord
5      contour is maintained.
                There are small foci of abnormal cord signal along the
6      dorsal aspect of C5 along the right anterolateral aspect at C6
       vertebral body levels.
7                The central stenosis noted at the C4-5, C5-6, and C3-4
       levels are secondary to degenerative changes, although I could not
8      exclude the presence of C5-6 disc herniation.
       CONCLUSION:
9      1.  Postoperative status, C3-C6.
       2.  Central stenosis with anterior cord deviation C6 level.
10     3.  Central stenosis without evidence of cord impingement
       although there is disc bulging or herniation at both C4-5 and C5-6
11     levels.
       4.  The cord foci of signal alteration at C5 and C6 levels may
12     represent small areas of ischemia/infarction.  The cord appears
       slightly diminished in size at this C5 level.
13  (CAR 246).

14      On July 27, 2006, Dr. Dickey completed another medical report in connection

15  with plaintiff's application.  Dr. Dickey reported his clinical findings included carpal tunnel

16  syndrome on the right, with motor weakness, diabetes with HbA1C 6.4, neuropathy, degenerative

17  joint disease in her neck, and depression.  Dr. Dickey indicated plaintiff's treatment consisted of

18  a variety of medications, but her response to the treatment was only fair to poor.  Plaintiff's

19  prognosis regarding her diabetes was fair; her prognosis regarding her degenerative joint disease

20  and cervical spondylosis was poor.  As to plaintiff's specific limitations, Dr. Dickey opined

21  plaintiff could only occasionally lift and/or carry objects weighing up to 20 pounds, and could

22  only sit, stand, and walk for one hour each in an eight hour day, but could do each for one hour at

23  a time without interruption.  As to the medical findings that support this assessment, Dr. Dickey

24  responded "pt's."  Dr. Dickey opined plaintiff could occasionally use her hands for simple

25  grasping and fine manipulation, and occasionally use her feet.  As for postural activities, Dr.

26  Dickey found plaintiff could never climb or crawl, but could occasionally balance, stoop, crouch

9

or kneel, due to chronic pain in her neck and back.  Dr. Dickey also found plaintiff was limited in her ability to reach, handle and feel occasionally; could never push or pull; but was unlimited in her ability to hear and speak.  Plaintiff was also limited as to heights, moving machinery, chemicals and vibrations.

**B.      Consulting  Physician's Reports**

Plaintiff had a comprehensive neurologic evaluation on September 18, 2005. Plaintiff's chief complaints were back pain and tingling of her hands and arms.  Plaintiff reported she had suffered from back pain and arm and leg numbness for the past 10 years.  She was controlling her pain with medication, but her pain was constant and she was unable to relieve the pain in any position.  She rated her pain at 10 out of 10.  She also reported she was scheduled for an MRI for the following month.

Plaintiff reported she was able to perform her own personal cleaning, hygiene and dressing.  She did not do housework, except vacuuming and her own laundry.  She was unable to mop, sweep, dust, drive or go grocery shopping.  Her medications included Motrin and Glucophage.

Dr. Dashtipour observed that petitioner is an obese woman, but noted she "walks to the clinic comfortably and to the office.  She claimed that she is in pain 10/10, but during examination, she was comfortable and was not in acute distress and pain." (CAR 165).  Her motor exam showed normal strength, bulk and tone.  Plaintiff's "gait shows antalgic on the right side, which is inconsistent.  When she walked to the clinic, it was worse than when she was leaving the clinic.  She does not have difficulty in turning or maintaining her balance.  She shows normal size of steps and swinging her arm bilaterally." (CAR 165).  She did not use an assistive device.

/ / /

/ / /

/ / /

1    Plaintiff's ranges of motion were as follows:

2    Cervical region: Lateral flexion 0-45 degrees, flexion chin to chest
     0-50 degrees, extension 0-60 degrees, and rotation 0-80 degrees.
3    Lumbar region: Flexion 0-80 degrees, extension 0-10 degrees, and
     lateral flexion 0-20 degrees.
4    HIP JOINTS: Forward flexion 0-100 degrees, backward extension
     0-30 degrees, rotation-interior 0-40 degrees, rotation-exterior 0-50
5    degrees, abduction 0-40 degrees, adduction 0-20 degrees
     bilaterally, but she shows discomfort when I assessed range of
6    motion in forward flexion on right side.
     KNEE JOINTS: Extension zero degrees, flexion 150 degrees
7    bilaterally.
     ANKLE JOINTS: Dorsiflexion 0-20 degrees and plantar flexion 0-
8    40 degrees bilaterally.
     SHOULDER JOINTS: Forward flexion 0-150 degrees, extension
9    0-40 degrees, abduction 0-150 degrees, adduction 0-30 degrees,
     internal rotation 0-80 degrees, external rotation 0-90 degrees
10   bilaterally.
     ELBOW JOINTS: Flexion-extension 0-150 degrees, supination 0-
11   80 degrees, and pronation 0-80 degrees bilaterally.
     WRIST JOINTS: Extension 0-60 degrees, flexion 0-60 degrees,
12   radial deviation 0-20 degrees, ulnar deviation 0-30 degrees
     bilaterally.
13   (CAR 165-66).

14   Dr. Dashtipour's general findings were that there was "no paravertebral muscle

15   spasms, tenderness, crepitus, effusion, deformities, or trigger points."  Plaintiff's diagnosis was

16   "[n]eck pain and low back pain secondary to degenerative joint disease."  (CAR 166).  Dr.

17   Dashtipour's functional assessment/medical source statement was:

18   [t]he number of hours the claimant could be expected to stand and
     walk in an eight-hour workday is eight hours.  The number of
19   hours the claimant could be expected to sit in an eight-hour
     workday is eight hours.  Assistive device is none.  The amount of
20   weight the claimant could lift and carry frequently is 25 pounds
     and occasionally 50 pounds.  There is a postural limitation on
21   frequent bending of the lumbosacral region and also frequent
     bending of the cervical region.  There are no manipulative
22   limitations on reaching, handling, feeling, grasping and fingering
     frequently or occasionally.  There are no relevant visual,
23   communicative, or workplace environmental limitations.

24   (CAR 166).

25   / / /

26   / / /

11

1          On October 4, 2005, an agency physician reviewed the record and found plaintiff

2   had no end organ damage as a result of her diabetes; has a history of back and neck problems, but

3   her back and neck range of motion is within normal limits; the consultative examiner reported

4   inconsistent antalgic gait; plaintiff's x-rays showed degenerative joint disease and hypertrophic

5   spurring.  The reviewing physician opined plaintiff was capable of a light residual functional

6   capacity ("RFC") with postural limitations.  However, the reviewing medical consultant

7   apparently found a medium RFC, as opined by the consultative examining physician, was more

8   appropriate. (CAR 153).

9          On October 11, 2005, an RFC evaluation was completed.  The RFC found

10  plaintiff capable of lifting 50 pounds occasionally, 25 pounds frequently, standing and/or walking

11  about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday,

12  and had an unlimited ability to push and/or pull, except for her lifting limitations.  The RFC

13  showed plaintiff had some postural limitations, but no manipulative, visual, communicative, or

14  environmental limitations.

15         A psychiatric review of plaintiff's records on October 14, 2005, found she may be

16  suffering from an affective disorder, but it is not a severe impairment.

17         **C.      Relevant Hearing Testimony**

18         At the administrative hearing held August 16, 2006, plaintiff, who was

19  represented by an attorney, testified as well as a vocational expert, George Meyers.

20         Plaintiff testified that she was 54 years old, graduated from high school, and is

21  right hand dominate.  At the time of the hearing, plaintiff was receiving state disability as her

22  only income and she last worked in May 2004 as a home health aid.  Her position as a home

23  health aid included housework, helping people with their daily activities, turning those who

24  needed turning, emptying bags, and preparing food.  She did not have any specific training,

25  except for on-the-job experience.  She worked full time, and held that position for two or three

26  years.  She stopped working because of her illness.  Between 1998 and 2000 she worked at

1   Printer Works, full-time, running the department for shipping and receiving, packaging, and

2   loading and unloading trucks.  She would typically be required to lift about 30 pounds.  Between

3   1990 and 1993, plaintiff worked at San Jose Labels as a machine operator.  This position was

4   also full time, and she operated a hot stamp machine, making adhesive labels for a variety of

5   bottles.  As a machine operator she was required to lift about 25 pounds twice a day, and she

6   could either sit or stand.

7           The ALJ inquired as to what prevented her from working.  Plaintiff stated it was

8   due to her right leg, right arm and neck.  Her treating physician was Dr. Dickey, and she saw him

9   at least once a month.  Her treatment included pain pills.  At the hearing plaintiff was wearing a

10  cervical collar, which she had been wearing for about three weeks.  She testified she had surgery

11  on her neck in February 2006.  However, the surgery did not help with her neck problems, in fact

12  she did not notice any difference at all.  She attended physical therapy for two weeks after her

13  surgery.  As to her back, plaintiff stated the "problem with the back is the hip, from the right

14  leg." (CAR 294).

15          Plaintiff testified that her 26 year old niece lives with her and does her housework.

16  Plaintiff will try to do the dishes or vacuum, but it is very hard for her to do.  She can, however,

17  still cook and take care of her personal hygiene herself.  Plaintiff stated she is able to go to the

18  grocery store, but she has stopped driving because of numbness in her hand and her right leg and

19  arm problems, so her niece usually does the grocery shopping.   Prior to her surgery, she had

20  tingling in her right arm; now she has no feeling in it at all; "it's dead."  Her surgeon, who

21  performed the surgery on her neck, told her there was nothing else he could do for her and that

22  there had been no guarantee the surgery would work.  Plaintiff also experiences tingling in her

23  left hand, although not as bad as the right.  Plaintiff had problems with her right arm and leg for

24  about two years prior to her surgery.

25          Plaintiff stated she could walk for about a half an hour and stand for about 20

26  minutes.  After that her feet and legs will start burning, so she will have to sit for a while.  She

1   can sit for about a half an hour, but then her hip or right leg will start throbbing so she will have

2   to get up and stand.  To pass the time during the day, plaintiff testified she will "work with my

3   Bible, and I do my work studying my Bible."  She attends church every Sunday at Sunday

4   morning services, but will have to get up and walk for a while during the services.  She does so

5   because she will experience pain in her right leg and feet, and so she will try stretching them

6   during a walk.  She believes she could lift a maximum of about 10 pounds.  In order to lift and

7   move a full gallon jug of milk, she had to use both hands.  About twice a week she will write for

8   about 15 minutes as part of her Bible study.

9        Plaintiff also testified to pain in her shoulder and neck, which she described as a

10  constant burn, and goes into her head making her head hurt.  She takes Vicodin for the pain

11  which helps, but it does not take the pain away.  She does not have a comfortable position.

12  Laying down is no more comfortable than sitting, standing or walking, and she is only able to lay

13  down for about half an hour.  Throughout the day, she is only able to lay down for about an hour

14  total.  However, she has no side effects from her medication.  She does lay down after taking the

15  Vicodin, but that is to ease the pain, not due to any side effects from the medication.

16       The numbness in her hands makes it difficult to use her hands; it makes it difficult

17  to do things like vacuuming, sweeping, and doing the dishes because she is unable to feel the

18  temperature of the water.  She also has the tendency to drop things, and has to use both hands to

19  lift things out of the oven.

20       She actually feels worse since her surgery.  She had an MRI after her surgery, and

21  her doctor said he was a little concerned about her "number five disc" but that there was nothing

22  else he could do for her.

23       The ALJ called George Meyers to testify as a vocational expert (VE).  The VE

24  classified plaintiff's past work as a home health aid and machine operator both as medium, semi-

25  skilled, SVP 3 and her position as a shipping and receiving clerk as medium, skilled, SVP 5.

26  / / /

14

1    The ALJ gave the following hypothetical to the VE:

2    a 54 year old individual with a high school education [with past
     work experience].  Further consider that this individual can lift 50
3    pounds occasionally and 25 pounds frequently.  She can stand and
     walk in combination for at least six hours in a workday, and can sit
4    without limitation when not required to stand or walk.  She can
     occasionally bend, stoop, squat, kneel and crawl, but should not
5    climb ladders or scaffolding.  Although she can climb stairs,
     should not work at heights or on hazardous moving machinery.
6    (CAR 302).

7    Given the above hypothetical the VE found she could work as a shipping and

8    receiving clerk and home health aide.  In addition, the VE found she could work as a warehouse

9    worker, a packing and filling operator, and a truck load checker.  She would have transferable

10   skills from the shipping and receiving clerk position including the skills for checking incoming

11   products against invoices and shipping tags.

12   Next, the VE testified that if the ALJ added a limitation to the above hypothetical

13   that the individual was only able to perform reaching and handling no more than occasionally,

14   plaintiff could not perform her past relevant work, nor could any of the other jobs identified be

15   performed with an occasional reaching limitation.  Finally, the VE testified that if the ALJ added

16   all of the limitations set forth by Dr. Dickey in his assessment, specifically the limitations as to

17   sitting (one hour), standing (one hour), and walking (one hour), plaintiff would not be able to

18   perform her past relevant work nor any other job.

19   **III.  STANDARD OF REVIEW**

20   The court reviews the Commissioner's final decision to determine whether it is:

21   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

22   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

23   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

24   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

25   support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

26   including both the evidence that supports and detracts from the Commissioner's conclusion, must

15

1   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

2   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

3   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

4   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

5   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

6   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

7   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

8   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

9   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

10  standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

11  Cir. 1988).

12  ### IV.  DISCUSSION

13          In her motion for summary judgment, plaintiff argues that the ALJ erred in two

14  ways in determining that she was not disabled.  Specifically, plaintiff argues: (1) the ALJ failed

15  to provide clear and convincing reasons for rejecting plaintiff's testimony regarding the severity

16  of her symptoms; and (2) the ALJ failed to give specific and legitimate reasons for disregarding

17  the opinion of plaintiff's examining physician.  Included in these claims of error, is that the ALJ

18  failed to assess all of plaintiff's limitations in his RFC.

19  ### A.     Plaintiff's Examining Physician's Opinion

20          The weight given to medical opinions depends in part on whether they are

21  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

22  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

23  professional, who has a greater opportunity to know and observe the patient as an individual,

24  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

25  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

26  / / /

to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  See id. at 831.  In any event, the Commissioner need not give weight to any conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see also Magallanes, 881 F.2d at 751.

Plaintiff argues that the ALJ failed to give specific and legitimate reasons for disregarding the opinion of her examining physician.

/ / /

/ / /

1          The ALJ stated in his opinion that he

2          gives minimal weight to Dr. Dickey's November 2005 and July
           2006 assessments of disability, as they are simply not supported by
3          objective medical evidence (Exhibits 11F, 17F).  Moreover, these
           opinions are brief and conclusory in form with little in the way
4          of clinical findings to support its conclusion.  The records are
           devoid of any description of detailed examinations or physical
5          findings related to the claimant's musculoskeletal structure.  Nor
           do the records contain any laboratory tests, i.e., x-rays, MRI scans
6          which would support his opinions.  Dr. Dickey's opinions are not
           consistent with his own findings or other substantial evidence of
7          record including the objective findings and observations, notes and
           opinions of other treating and examining physicians.  On the
8          whole, the doctor appears to have accepted the claimant's
           subjective complaints, and the above-noted opinions appear
9          reflective of a position of "advocate" for the patient.  As such, Dr.
           Dickey's opinions are not supported by the overall evidence of the
10         record and they are not afforded significant weight in this
           decisionmaking process in accordance with SSR 96-5P.  Since the
11         claimant's representative stated at the hearing that all relevant
           medical records have been submitted, I do not consider it necessary
12         to recontact Dr. Dickey for clarification.

13    (CAR 21).

14         In support of her contention that the ALJ failed to provide sufficient reasons for

15    disregarding Dr. Dickey's opinion, she simply discussed Dr. Dickey's opinion of her disabilities.

16    She then argues:

17         Additionally, the ALJ stated that there was no need to contact the
           physician because Plaintiff's attorney had offered that all medical
18         records had been submitted into evidence.  However, the ALJ
           should have contacted Dr. Dickey regarding the meaning of the
19         notation "pt's" that was noted by Dr. Dickey as evidence in support
           of the limitations that the vocational expert testified would exclude
20         Plaintiff from all work.

21    (Plaintiff's Motion at 17).

22         Defendant argues the ALJ's decision was supported by proper reasons,

23    specifically that the ALJ noted Dr. Dickey's examination findings were minimal and did not

24    support the restrictive functional assessments.  Defendant argues the ALJ's decision is well

25    supported by the record, in that the treatment records from Dr. Dickey included only minimal

26    clinical findings, and most appear to simply accept plaintiff's subjective complaints.  In addition,

1  defendant claims that Dr. Dickey's assessment of plaintiff's limitations is not supported by his

2  own clinical findings, and is inconsistent with other substantial evidence of record, including

3  treatment notes from Dr. Glenn-Lawson and Alameda County Medical Center.  Defendant also

4  argues that the ALJ's opinion was proper given the conflicting report by an examining physician

5  based on independent clinical findings.

6        The court agrees.  The ALJ set forth specific and legitimate reasons for not

7  accepting Dr. Dickey's assessment of plaintiff.  These reasons are supported by the record.  Dr.

8  Dickey's assessment and opinion was contradicted by Dr. Dashtipour, an examining medical

9  professional whose opinion was supported by independent clinical findings.  In such a

10 circumstance, the ALJ may resolve the conflict of medical opinions.  In this case, the ALJ found

11 Dr. Dickey's opinion was conclusory and not supported by the evidence.  Dr. Dickey's records

12 include only minimal clinical findings and that it appears he simply accepted plaintiff's

13 subjective complaints.  Accordingly, he did not accept the limitations set forth in Dr. Dickey's

14 assessment of plaintiff.  Instead the ALJ found plaintiff capable of medium work, which was Dr.

15 Dashtipour's assessment as well as that of the non-examining medical professional opinions.

16       In addition, the medical records indicate that plaintiff's surgery was at least

17 partially successful in alleviating some of her symptoms.  She had an MRI in July 2006, after her

18 surgery.  The report from that MRI, as interpreted by a medical professional, indicates some

19 improvement in plaintiff's cervical spine.  Specifically, in contrast to her November 2005 MRI,

20 the July 2006 MRI shows no cord impingement, and minimal central stenosis.  There was some

21 disc bulging or herniation, and the cord appeared slightly diminished, but this is an improvement

22 over the previous MRI which showed severe cord compression with abnormal cord signal.  Thus,

23 the ALJ's reliance on the examining medical professional's opinion, even though it occurred

24 prior to plaintiff's surgery, was supported by the substantial evidence.  It was not unreasonable to

25 / / /

26 / / /

1   conclude the limitations placed on plaintiff's abilities prior to her surgery were still adequate to

2   address plaintiff's condition following the surgery.  The court finds no error.[1]

3          Plaintiff also claims the ALJ erred by not including her need to use a cane and her

4   manipulative limitations in her RFC.  However, there is no support for this contention.  Plaintiff

5   indicated in her Daily Activities Questionnaire that as of November 18, 2005, the date she signed

6   the form, she did not use a cane.  (CAR 134).  There are only two notations in plaintiff's medical

7   records indicating she used a cane, and both of those occurred in 2004.  None of the doctors,

8   even her own treating physician, noted she needed any assistive device.  In fact, Dr. Dashtipour's

9   specifically found she did not need any assistive devices.  He also found that she had no

10  manipulative limitations.  As such, the ALJ did not err in failing to include these limitations in

11  plaintiff's RFC.

12         **B.     Plaintiff's Credibility**

13         The Commissioner determines whether a disability applicant is credible, and the

14  court defers to the Commissioner's discretion if the Commissioner used the proper process and

15  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

16  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

17  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

18  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

19  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

20  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

21  credible must be "clear and convincing."  See id.

22  / / /

23

24         [1]     Plaintiff also appears to argue the ALJ failed to fulfill his duty to develop the
    record by failing to question Dr. Dickey in regards to his notation of "pt's" as support for his
    findings.  However, plaintiff fails to develop this argument.  To the extent she raises this issue,
25  the court finds the ALJ properly fulfilled his duty by obtaining a consultative examination of
    plaintiff, which resolved any inadequacy or conflict there may have been in the record.  See
26  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

1    If there is objective medical evidence of an underlying impairment, the

2 Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

3 because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

4 341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

5 the symptoms alleged, including aggravating factors, medication, treatment, and functional

6 restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

7 the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

8 testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

9 prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

10 physician and third-party testimony about the nature, severity, and effect of symptoms.  See

11 Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

12    Plaintiff contends that the ALJ erred in finding her testimony not entirely credible

13 in regards to her ability to lift no more than 10 pounds, discrediting her testimony regarding her

14 need to lie down, and failing to include manipulative limitations on her right hand use in the

15 RFC.  Plaintiff argues the ALJ relied on the medical consultative reports which did not have the

16 benefit of the MRIs she had in October 2005 and November 2005.  This argument is better suited

17 as support for her contention that the ALJ erred in relying on the medical consultative reports

18 instead of her treating physician, which the court finds unpersuasive as discussed above.

19    In his decision, the ALJ stated:

20    I find that the claimant's medically determinable impairments
     could reasonably be expected to produce the alleged symptoms, but
21    that the claimant's statements concerning the intensity, persistence
     and limiting effects of these symptoms are not entirely credible.
22         The claimant testified to an inability to work due to severe
     right leg, right arm, and neck pain.  She also testified to back and
23    hip pain, as well as numbness of both upper extremities.  In
     addition, she testified that she was able to walk for only 30
24    minutes; stand for only 20 minutes and sit for only 30 minutes.
     The objective medical findings and the level of treatment,
25    however, are not suggestive of this level of severity.  The claimant
     testified that she must lie down for up to 1 hour per day.  However,
26    there is no objective medical basis to support this allegation.  In the

1
2
3
4

> absence of objective medical evidence to support these allegations,
> the ALJ gives minimal weight to this testimony.  The claimant's
> complaints regarding the frequency, severity and duration of her
> diabetes mellitus, back pain, upper extremity and lower extremity
> pain and hand numbness do not justify any further limitations than
> those based on the objective medical evidence and are not
> generally consistent with the limitations found.

5  (CAR 22).

6        As to her inability to lift more than 10 pounds, plaintiff argues the severity of her

7  back pain *is* supported by the objective medical evidence in the record.  Plaintiff does not point

8  to any specific evidence in the record to support her contention.  A review of the record does

9  indicate that she complained to her doctors regarding her back pain.  However, even her treating

10  physician, Dr. Dickey, found plaintiff could lift up to 20 pounds, which is inconsistent with her

11  claim of a 10 pound limit.  Contrary to the plaintiff's contention, the ALJ discounted her

12  testimony due to the lack of objective medical evidence *and* the level of treatment she received.

13  These reasons are supported by the evidence and are sufficient.

14        As to plaintiff's testimony regarding her need to lie down, the undersigned finds

15  her argument similarly unpersuasive.  In her motion, plaintiff argues that she testified that she

16  needs to lie down every day for 30 minutes after taking her medication, Vicodin.  She also states

17  that she has been diagnosed with obesity, and that obesity can cause excessive daytime

18  sleepiness.  The court finds plaintiff's argument unpersuasive.  Plaintiff misconstrues her own

19  testimony and raises arguments which were not before the ALJ.  Plaintiff alludes to excessive

20  tiredness due to obesity, but fails to claim her obesity actually causes her excessive tiredness.

21  Instead she states "Plaintiff was diagnosed with medical obesity. . . . Obesity can cause excessive

22  daytime sleepiness." (Plaintiff's Motion at 14.)  However, although she was diagnosed with

23  obesity, the record does not support her contention that her obesity caused or exacerbated any of

24  her symptoms, nor her contention that her obesity caused her to be excessively tired requiring

25  naps.  There is no evidence in the record that plaintiff ever reported excessive tiredness to her

26  physicians, nor did any medical professional consider her obesity as contributing to her

1   limitations.  Her allegation that her obesity caused her need to lie down is not supported by the

2   evidence.

3              As to the credibility of her testimony, she claims in her motion that she needs to

4   lie down every day due to her medication.  However, plaintiff specifically testified at the hearing

5   that she had no side effects from her medication, and her need to lie down was from pain not

6   because of her medication.  (CAR 299-301.)  Therefore, this contention is not supported by the

7   record.  In addition, the ALJ did not reject plaintiff's testimony outright .  He found some of

8   plaintiff's testimony to be somewhat credible, and that her testimony regarding her need to lie

9   down was minimally credible.  As noted above, plaintiff never reported to any of her treating

10  physicians a need to lie down, nor is there any support for this limitation indicated in the record.

11  The court finds no error in the ALJ's determinaiton.

12             Finally, as to plaintiff's manipulative abilities of her right hand, the ALJ

13  specifically found no support for that contention.  The ALJ notes that although Dr. Dickey

14  diagnosed carpal tunnel syndrome in his July 2006 assessment, there is no substantial support for

15  this diagnosis in the treatment records.  In addition, the ALJ determined that her complaint

16  regarding hand numbness does not justify further limitations than those based on the objective

17  medical evidence and is generally consistent with the limitations found.  The only support for

18  plaintiff's contention is the conclusory report from Dr. Dickey which the ALJ permissibly

19  discounted.  Accordingly, the court finds no error on the ALJ's failure to include manipulative

20  limitations.

21             The court agrees with the defendant that there is sufficient evidence in the record

22  for the ALJ's credibility determination.  The ALJ does not solely rely on the lack of objective

23  medical evidence to support her testimony.  Rather the ALJ found that in addition to the record

24  lacking medical support, the level of treatment she sought was not consistent with the subjective

25  limitations she testified about.  For example, the ALJ pointed out that the "medical records

26  indicate continued improvement in the claimant's condition" following her surgery.  The court

1    agrees.  In fact, following her surgery, she reported her pain had resolved, and her strength had

2    increased to a 5/5.  There are few medical records following plaintiff's surgery in the record,

3    despite the six months between the surgery and the administrative hearing.  The ALJ's reasons

4    for discounting plaintiff's testimony were sufficient, and the court will not substitute its judgment

5    over the commissioner's.

6           However, even if there was error in the ALJ's credibility determination, the court

7    finds this error would be harmless.  See Batson v. Comm'r, 359 F.3d 1190 (9th Cir. 2004).

8    When there is evidence which reasonably supports either confirming or reversing the ALJ's

9    decision, the court cannot substitute its judgment for that of the ALJ.  See Tackett v. Apfel, 180

10   F.3d 1094, 1098 (9th Cir. 1999).  In a credibility determination, where the ALJ provides specific

11   reasons for finding a claimant less than fully credible, "we focus on the validity of the ALJ's

12   underlying decision, and not necessarily on whether the ALJ would come out differently if the

13   case were remanded after error was identified by the court."  Carmickle v. Comm'r, 533 F.3d

14   1155, 1163 (9th Cir. 2008) (citing Batson v. Comm'r, 359 F.3d 1190, 1197(9th Cir. 2004); Stout

15   v. Comm'r, 454 F.3d 1050, 1055 (9th cir. 2006)).

16          Here, the ALJ found plaintiff had an impairment which could reasonably be

17   expected to produce pain or other symptoms.  He then found plaintiff's testimony to be not

18   entirely credible regarding the severity of her symptoms, because it was not consistent with the

19   objective medical findings and was not consistent with the level of treatment she obtained.

20   Plaintiff claims the ALJ's reliance on the medical evidence is not sufficient to find her not

21   credible.  However, if we look beyond the ALJ's opinion, under Carmickle, to the evidence

22   before the court, there is sufficient evidence to support the ALJ's determination.

23          Specifically, there is inconsistency in her medical records.  The medical records

24   indicate that although she generally appeared for her examination in no apparent distress, she

25   regularly rated her pain at a level 10/10.  At her consultative neurological examination, Dr.

26   Dashtipour noted that she claimed her pain was 10/10, but she stated she was comfortable and

24

not in any acute distress and pain.  Dr. Dashtipour also noted her gait was inconsistent, in that it was more antalgic when she was walking to the clinic than when she left, and she had no difficult in turning or maintaining her balance.   In addition, plaintiff underwent surgery in February 2006. The hearing before the ALJ occurred in August 2006.  Plaintiff testified at the hearing that the surgery did not help her at all, and in fact she feels worse after the surgery.  However, between February and August 2006, other than two follow ups and a medication refill appointment, plaintiff was not seen by any physician.  In fact, at her March 15, 2006, follow up after her surgery, she reported her pain had resolved, and her strength had increased to a 5/5.  This treatment record, as stated by the ALJ, is not consistent with an increase in her symptoms as she testified.  The court finds the ALJ did not err in his determination of plaintiff's credibility.  To the extent there may have been an error, the court finds the error harmless and finds the ALJ's underlying decision to be valid.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.      Plaintiff's motion for summary judgment is denied;

      2.      Defendant's cross-motion for summary judgment is granted; and

      3.      The Clerk of the Court is directed to enter judgment and close this file.

DATED: September 23, 2008

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE